## Continuation of Application for Search Warrant

Based on my knowledge, training and experience, and the investigation of law enforcement officers with personal knowledge and with whom I am working, I, Sarai Ramos, being duly sworn, depose and state as follows:

### INTRODUCTION

Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically, Title 21, United States Code, Section 841(a)(1) [Distribution and Possession with Intent to Distribute Controlled Substances] will be found the following electronic devices:

1. Black LG Stylo Smart Cell Phone
2. Black Apple iPhone with a shattered screen in a Black and Red case,
3. Grey Apple iPhone in a clear and Black case, and
4. Blue Samsung Smart Cell Phone,

(hereinafter the **"Subject Devices"**). The categories of electronically stored information and evidence sought are described in Attachment B.

This Application requests the issuance of a warrant to examine the International Mobile Equipment Identity numbers (IMEIs) for **Subject Devices** which were seized on February 24, 2020, following a controlled operation and arrest at 376 Hope Ave. Apt. #3, Holland, Michigan 49423, as authorized in Case No. WMT-060-2020. Upon finding that one of the **Subject Devices** has the IMEI number **355865101142040**, this Application requests that the issued warrant authorize a search of the contents of that device only for evidence of drug distribution, contrary to 21 U.S.C. § 841(a).

### APPLICANT'S TRAINING AND EXPERIENCE

I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have been since March 2020. I have been employed with the Holland Department of Public Safety (HDPS) since 2015. I am currently assigned to the West Michigan Enforcement Team (WEMET), which has a specific focus on investigating drug crime within the Western District of Michigan. I have received training in the investigation of controlled substances and firearms. I have learned the methods by which firearms are trafficked and narcotics are packaged and consumed through professional experience as well as my association with other members of law enforcement. This training has made me knowledgeable in firearm trafficking and drug trafficking and manufacturing.

I also know from training and experience that drug and firearms traffickers frequently utilize mobile telephones to facilitate transactions. Mobile telephones are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so traffickers often use the devices in an effort to avoid detection by law enforcement. Mobile phones often contain evidence indicative of drug and gun trafficking, including records of incoming and outgoing calls and text messages with suppliers; voicemail messages; photographs of drugs and firearms, coconspirators, or currency; and, in the case of

"smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device was in high drug trafficking areas or evidencing the route used in trafficking narcotics and firearms. Additionally, drug traffickers typically maintain and use multiple mobile phones to facilitate sales, and frequently switch phones to evade detection by law enforcement. Further, these types of devices are frequently used to access social media websites such as Facebook, Instagram, etc. In my training and experience, drug and firearms traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of narcotics.

**PROBABLE CAUSE THAT ONE OR MORE OFFENSES HAVE BEEN COMITTED**

1. Members of the Western Michigan Enforcement Team (WEMET) are currently investigating a heroin/fentanyl overdose death of Scott Louis Lecompte, at 376 Hope Ave #3, Holland, Michigan 49423.

2. On 02/22/2020, at approximately 2:41 PM, the Holland City Department of Public Safety (HDPS) was dispatched to an unconscious and unresponsive 49-year-old male at 76 Hope Ave #3 in Holland, Michigan. WEMET Detective Curt Young spoke with Holland Police Sergeant Scott Weiss when he arrived on scene. Sgt. Weiss stated Erin Hambright admitted to police that both she and her boyfriend, Scott LeCompte, had used heroin on the night of 2/21/2020. Erin Hambright told police that she had found Scott unresponsive in their apartment the next day. She told police that she called her friends Shanoah Kooyers and Todd Gavitt to help try to wake up Scott. Shanoah Kooyers then called 911 for help.

3. Ms. Hambright gave police permission to search her apartment. HDPS officers found a brownish colored powder in a closet off the living room. The powder looked like heroin. Det. Young seized the narcotics and WEMET Detective Nicholas Khodl tested the brownish colored powder using NARK II, which stands for Narcotics Analysis Reagent Kit. When the powder was tested, it immediately yielded an orange color which indicated it was Fentanyl. Within seconds, the color shifted to a purple color which indicated it was Heroin. This NARK II Fentanyl Reagent kit tests for the presence of Fentanyl (Acetyl-fentanyl) and for the presence of Heroin. The powder weighed approximately 0.7 grams.

4. Det. Young interviewed Erin Hambright on 02/22/2020 at the Holland Hospital, after the overdose occurred. She told Det. Young the following:

   a. On 02/21/2020, Erin Hambright and Scott Lecompte had sent a text message to a person they know only as "D," using Scott Lecompte's cell phone. Via text, they asked to purchase marijuana.

   b. Afterwards, "D" had arrived at their apartment with the ordered marijuana. While "D" was selling them the marijuana, he asked them if they would be interested in purchasing some "boy" which is a slang term for heroin. Erin Hambright and Scott Lecompte accepted the offer and bought $50 worth of heroin. "D" gave them a brownish colored powder and, as he was leaving, told them to be careful with it.

  c. After "D" left, Erin Hambright and Scott Lecompte "snorted" some of the heroin sometime between 9pm and midnight. She passed out after snorting the drug, and woke up later with Scott Lecompte on top of her and trying to get her to wake up. She passed out again some time later and woke up to find Scott Lecompte unresponsive.

  d. Erin Hambright did not know "D's" real name or information. She and Lecompte had contacted "D" using Lecompte's cell phone and "D's" number would be stored under "D" on Scott Lecompte's cell phone.

  5. Det. Young obtained a search warrant from the Ottawa County 58th District Court for Scott Lecompte's phone and located a cell phone number for the subject named "D". The number for "D" was (616) 589-2510. Det. Young then entered this number into the website Accurint.com, a phone number database, which can be accessed specifically by law enforcement personnel. The website showed the phone number belonged to a man named Joaquin Lee Donaldson.

  6. Det. Young searched LEIN and found a suspect named Joaquin Lee Donaldson. He then took a photo lineup that included Donaldson's photo, along with five others, and showed it to Erin Hambright. She pointed to Joaquin Donaldson's photo and said that this was "D." She said she was 100% sure on the identification.

  7. The search warrant that had authorized the search of Lecompte's phone also authorized using the phone to identify and apprehend the person who sold drugs to Lecompte. Under this authority, Det. Young began texting Donaldson on Scott Lecompte's cell phone on 02/24/2020. He asked Donaldson if he would come to 376 Hope Ave. to drop off heroin to the house. Donaldson agreed to come to the house and sell the heroin.

  8. WEMET detectives set up surveillance by way of watching the residence within eyesight in their unmarked police vehicles on 376 Hope Avenue for Joaquin Donaldson's arrival. WEMET detectives saw Donaldson arrive on February 24, 2020 in a 2003 Black GMC Yukon, MI-REG DXG5758. Another man, later identified as Michael Taylor, was riding in the front passenger seat. Det. Young watched Donaldson open the driver's door of the Yukon, step out, and walk toward Scott Lecompte's apartment. Det. Young communicated to the other detectives over the in-car radio that Donaldson was making his way to the apartment.

  9. As Donaldson walked towards the apartment, D/Sgt. John DeYoung walked up to Donaldson in full police markings and identified himself. D/Sgt. DeYoung told Donaldson not to move, but Donaldson took off running. D/Sgt. DeYoung and D/Lt. Andrew Foster chased after Joaquin Donaldson until he slipped and fell on the ground. D/Sgt. DeYoung also fell and immediately attempted to handcuff Donaldson but Donaldson refused to comply with D/Sgt. DeYoung's verbal commands to stop running from police. Donaldson then stood up and attempted to run away from police again but D/Lt. Foster was able to push Donaldson down to the ground and with D/Sgt. DeYoung's help, they we able to handcuff Donaldson and place him under arrest.

10. As D/Sgt. DeYoung was running after Donaldson, he saw Donaldson throw something. After handcuffing Donaldson, D/Sgt. DeYoung walked back to the place where he saw Donaldson throw something. He found a found a small, clear, plastic bag with white powder inside that looked like cocaine. D/Sgt. DeYoung picked up the bag, and turned over to Det. Khodl who logged it into evidence and field tested the powder using the Tru-Narc field tester. The results were positive for cocaine. The baggie containing the cocaine weighed 1.59 grams with packaging.

11. Earlier, when Donaldson got out of the GMC Yukon and started walking towards Lecompte's apartment, Michael Taylor had remained behind in the vehicle. Police ordered Taylor to get out of the vehicle after Donaldson fled. He obeyed, but when he first stepped out of the Yukon, he had and had his hands down the front of his pants as if he had a weapon or he was trying to hide something. Officers on scene ordered him to put his hand behind his back, and he complied. Police arrested him based on warrants for his arrest out of Grand Rapids.

12. WEMET officers searched the Yukon Donaldson had been driving. They found 1.23 grams of a plastic bag which contained a tan-colored powder inside that looked like heroin in the center of the driver's seat where Donaldson had been sitting. It was field tested using a Nark II field tester with positive indication for heroin.

13. Both Joaquin Donaldson and Michael Taylor were transported to Holland Department of Public Safety. Because Donaldson and Taylor had been arrested in the course of a narcotics investigation and because D/Sgt. DeYoung knew from his twenty-five years employed as police officer and his thirteen years of experience specifically investigating drug offenses that narcotics traffickers often hide narcotics on their person, D/Sgt. DeYoung authorized a strip search of both subjects once they arrived to the HDPS jail. Police told Donaldson that they were going to strip search, and they asked if he had any other narcotics or other contraband. He told police he did not have anything on his person. Police strip searched him and found nothing.

14. Police also told Michael Taylor that they were going to strip search him, and they asked if he had any narcotics or other contraband. He said he did not have anything on his person. As Det. Young was strip searching Taylor, he saw a clear, plastic baggie of a white substance when Taylor lifted up his own scrotum. Det. Young asked Taylor what that was and to hand it over. At first, Taylor grabbed it with his own hand and tried to hide it in his hand. but eventually Taylor did hand the bag over to Det. Young. The baggie weighed 6.61 grams with packaging. The white powder was field tested using the TRU-NARC with a positive indication for cocaine.

15. The **Subject Devices** are currently in storage at the WEMET Ottawa County office. All of the **Subject Devices** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **Subject Devices** were first seized on February 24, 2020.

16. The **Subject Devices** were seized at the time of Donaldson's arrest. **Subject Device's 1, 3, and 4** were all located inside Donaldson's Yukon within the driver seat area. **Subject Device 2** was located by detectives under an unrelated vehicle of the apartment parking

lot where Donaldson was fleeing from police. Based on the evidence above, I believe one of the **Subject Devices** was assigned the phone number (616) 589-2510 and was the device that Donaldson used to communicate with Lecompte on the date of his death. Based on the evidence above I also believe Donaldson used the same device on 2/24/2020 to communicate with the person he thought was Lecompte in order to set up another drug transaction.

17.  I am aware through my training and experience that smartphones such as the **Subject Devices** contain a piece of computer hardware called a Subscriber Identity Module (SIM card). Each SIM card is inscribed with a unique number called the International Mobile Equipment Identity number (IMEI). Every time a smartphone communicates with a cellular service tower, it communicates its IMEI to the cellular network. Thus, cellular network providers associate each phone call and text message sent through its network to a specific IMEI number. To determine a device's IMEI, a person does not need to access any of the data stored on a phone. Rather, all that is necessary is to remove the SIM card and physically read the IMEI digits on the card.

18.  On 5/20/2020, I received administrative subpoena results from Special Agent Heather Williamson of the Drug Enforcement Administration. These results contained tolling and IMEI data from T-Mobile, the owning service provider for the phone number (616) 589-2510 on 2/22/2020 through 2/24/2020. The results did not contain the contents of any communications. However, the subpoena results show that the IMEI assigned to (616) 589-2510 from 2/22/2020 through 2/24/2020 was **355865101142040**.

19.  Based on the evidence recited in the above paragraphs, I submit there is probable cause to believe that the device bearing this IMEI number on its SIM card is the device that Donaldson used to set up the drug transactions described in this continuation. As described in Attachment A, I am seeking authorization to examine the physical components of all four of the **Subject Devices** to determine if any of them bear the IMEI **355865101142040.** If one of them does bear this IMEI, then I am seeking further authorization to search the data stored on that device only for evidence of the drug activity set forth in this continuation.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20.  The warrant applied for would authorize the extraction and copying of electronically stored information, all under Rule 41(e)(2)(B).

21.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device used to access the Internet. This information can sometimes be recovered with forensics tools.

22.  *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate forensic electronic evidence that establishes how the **Subject Devices** were used, the purpose of the use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on one of the **Subject Devices** because:

      a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Once again, as explained above, I am seeking authorization to search the physical components of the devices to determine if any of them bear the IMEI **355865101142040**. I am also seeking authorization to search the information stored on the device that has this IMEI, if the physical inspection shows that the device has this IMEI. The examination of the other devices will be limited to the physical examination necessary to determine their IMEIs.

    24. *Time of execution.* Serving this warrant will not require intrusion into a dwelling, place of business, or similar real property. Rather, service will consist of examining the **Subject Devices** which are already in government custody. Accordingly, there is good cause to authorize execution of the requested warrant at any time of the day or night.